Warren J. Stapleton
OSBORN MALEDON P.A.
2929 North Central Avenue
Phoenix, Arizona 85012
Telephone: (602) 640-9305
Facsimile: (602) 640-9050
wstapleton@omlaw.com

*Attorneys for International Technical Coatings, Inc.*

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>INTERNATIONAL TECHNICAL COATINGS, INC.,<br><br>            Debtor. | Case No. 2-15-bk-14709-MCW<br><br>CHAPTER 11<br><br>**DECLARATION OF FARUK GOLE IN SUPPORT OF FIRST DAY MOTIONS**<br><br>DATE: November __, 2015<br>TIME: __:__ _.m.<br>LOCATION: 230 North First Avenue<br>            Phoenix, Arizona<br>            Courtroom xxx, $x^{th}$ Floor |

I, Faruk Gole, hereby declare under penalty of perjury of the laws of the United States as follows:

1. I am an adult person, and I am a resident of Maricopa County.

2. During all relevant times, I have been directly involved on a full-time basis with the development and operation of the above captioned Debtor. My official title is Chief Executive Officer.

3. I am the person most familiar with the Debtors' assets, liabilities, and their financial circumstances and challenges.

4. Over the years, I have directly and indirectly invested several million dollars in the Debtors and their businesses.

5. My formal education was obtained at the University of Evansville, where I received a Master of Arts in Business in 1982. Since 1982, I have held a variety of

manufacturing-related jobs. From 1992 forward, I have concentrated in the metal fabrication industry – specifically working with companies manufacturing steel wire and related products. I have been a plant manager, a vice president of operations, and chief executive officer for these businesses. It is fair to say that I know virtually all aspects of the steel wire fabrication business including, operations management, manufacturing, strategic planning, process improvement, inventory management and logistics. I started with International Technical Coatings, Inc. ("ITC") in 2007. I am currently ITC's chief executive officer ("CEO") and president.

6. I am submitting this Declaration in support of the motions that were filed after these bankruptcy cases were initiated (the **"First Day Motions"**). The statements contained herein are based upon my personal knowledge and/or upon the Debtors' books and records maintained in the ordinary course of business by persons with knowledge of their contents and that were created at or near the time of the relevant acts, events, or conditions as to which the business records relate.

I.  **BACKGROUND**

**HISTORY OF THE DEBTORS**

7. ITC is steel wire manufacturing business with facilities located in Phoenix, Arizona and Columbus, Ohio. ITC's manufacturing facilities are located at 110 S. 41st Avenue, Phoenix, AZ 85009 (the "Phoenix Facility") and 845 Markison Avenue, Columbus OH, 43207 (the "Columbus Facility"). ITC's corporate headquarters is located at the Phoenix Facility.

8. ITC is the premier manufacturer of wire mesh products for the material handling and storage products industries. As one of the largest wire and steel fabricators in the United States, ITC manufactures a wide range of wire products including heavy and light duty wire mesh decking, dividers and flue spacers, gridwall/slatwall, POP displays, industrial and specialty drawn wire, custom wire and steel products, mine mesh, re-enforcing mesh, laser cutting, fencing and roll formed products. In addition, ITC offers value-added services such as product design and engineering to meet the needs of distributors, mass merchants,

retailers, archive storage providers, OEM's and third-party logistics providers.

9. ITC's diverse customer base includes leading national chains such as Home Depot, Lowe's, Wal-Mart, IKEA, and a network of more than 2,500 distributors. With over 900,000 square feet of manufacturing and distribution facilities strategically located in both the Western and Eastern halves of the United States, ITC services the U.S., Mexico and Canada. All ITC products are manufactured in the U.S., assuring the highest quality standards available in the industry.

10. ITC's sole shareholder is Johnnie Caldwell ("Caldwell"). Previously, ITC had been owned 62% by Tommy Fisher ("Fisher") and 38% by Caldwell. Subsequently, Caldwell and Fisher negotiated a separation of Fisher from the business under which Caldwell bought Fisher's shares for approximately $6,000,000. In addition, Caldwell and ITC agreed to make certain additional payments to Fisher, and provide Fisher with certain financial information. The parties also exchanged mutual releases (the "Fisher Settlement Agreement").

11. On or about July 14, 2011, ITC borrowed approximately $28.3 million from Bank of America ("BofA" or the "Bank") pursuant to 3 different loans: Facility #1 ($20,000,000); Facility #2 ($5,000,000); Facility #3 ($3,300,000). In August 2012, ITC borrowed $15,000,000 from the Bank – the Facility #4 loan. In April 2014, ITC borrowed $10,690,000 from the Bank – the Facility#5 loan – which was used to pay off Facility #2 and Facility #4. Currently, ITC owes the Bank approximately $25.7 million.

12. The loans are secured by a deed of trust on the Phoenix Facility, a blanket lien on ITC's assets, and the personal guarantees of Caldwell and Fisher. The Bank's lien is the senior lien on virtually all of ITC's assets with the exception of certain equipment covered by a lien held by the Director of Development, State of Ohio – which relates to capital improvements to the Columbus Facility. In addition, there are several equipment lessors that have filed UCC-1s, including NMHG Financial Services ("NMHG"), Mitel Leasing, Inc. ("Mitel"), and U.S. Bank Equipment Finance ("US Bank").

13. The Facility #1 loan matured on August 15, 2015. Although ITC was current

on all monthly payments due to the Bank on the loans – and continued to make monthly interest payments on the matured Facility #1 even after it matured – the Bank put ITC into default. ITC had anticipated that this loan would be restructured, or that an adequate amount of time for refinancing would be made available to ITC prior to the Bank taking any collection activity. The parties did attempt to negotiate a forbearance agreement but were unsuccessful.

14. Subsequently, on October 28, 2015, the Bank applied for the appointment of a receiver over ITC. The Maricopa County Superior Court (the "State Court") held an initial hearing on the matter on November 4, 2015. A final hearing on the appointment of a receiver was scheduled for Wednesday, November 18, 2015 at 1:30 p.m. Unable to secure an agreement with the Bank prior to the scheduled hearing, ITC filed for Chapter 11 protection.

### REASONS FOR BANKRUPTCY FILING

15. ITC filed for bankruptcy relief to restructure its debt obligations – primarily those owing to the Bank. ITC believes that its overall business plans and strategies are sound and will be successful if certain of their debt obligations can be restructured. In this regard, particular emphasis will be placed on refinancing the Bank's obligations – utilizing not only ITC's assets, but also the personal assets of Caldwell. Given ITC's assets, and its cash from operations, ITC is confident that it has the resources needed to obtain refinancing. Subject to Court approval, the Debtors have retained Osborn Maledon, P.A. as its bankruptcy and restructuring counsel (the "**Firm**"). ITC believes that the Firm has the experience and knowledge to assist them in their restructuring efforts.

II. **FIRST DAY MOTIONS**

### CASH COLLATERAL MOTION

16. ITC generates cash by selling its manufactured wire products and the services that go with those products. Currently, it has $440,000 cash on hand. The Bank has a blanket lien on ITC's assets (primed only by the Director of Development, State of Ohio's lien on certain personal property located at ITC's Columbus Facility). The Bank's lien

covers ITC's accounts, contract rights, deposit accounts, inventory, machinery, furniture, fixtures, chattel paper, certificates of deposit, documents of title, and cash, and the cash that is derived from the Bank's collateral (ITC's cash on hand, and cash derived from the sale of the Bank's collateral is hereinafter referred to as the "Cash Collateral"). At this point, based upon the public records available, it appears only the Bank has a security interest in ITC's Cash Collateral.

17. To the extent that the Bank demonstrates an unavoidable perfected security interest in the Cash Collateral, then the Bank is entitled to adequate protection in exchange for ITC's use of the Cash Collateral. In this case, ITC proposes to provide a replacement lien to the Bank covering the Cash Collateral. The Replacement Lien will have the same priority and validity as the pre-petition lien as to which it relates, and will be capped at the value of the Cash Collateral as of the Petition Date. In addition, ITC will continue to pay the Bank the interest due on all credit facilities at the non-default rate of interest (1.35% + LIBOR). The payments by the Debtor shall be made in accordance with the attached budget. *See* Exh. A attached to the First Day Cash Collateral Motion.

## EMPLOYEE OBLIGATIONS MOTION

18. Collectively, the Debtors employ over 233 full and part-time employees (the "**Employees**") that receive direct financial benefits, health insurance contributions, and related benefits (the "**Employee Obligations**"). The Employees receive salaries, hourly wages and/or commissions, and are employed in the actual manufacture, sale, distribution and administration of ITC's products. The Employees are paid weekly. Employee payroll is managed by Paychex. After the payroll data is provided to Paychex, Paychex issues Employee checks net of all taxes, which are withheld and paid to the appropriate taxing authority. Thereafter, Paychex bills the ITC for their employer share of the Employee withholding taxes. ITC has funded these tax obligations for the last payroll period that ended on November 12, 2015. ITC funded its payroll account to pay its Employees on November 17, 2015 and the funds for those Employees with electronic direct deposit were swept to those individual Employees' personal accounts on the night of November 17, 2015. The

Employees that do not have direct deposit will receive live checks on Thursday November 19, 2015. In addition, Paychex will debit ITC's payroll account to cover the Employee withholding taxes on November 19, 2015. As of the petition date, Employee Obligations totaled about $185,000, including the amounts that went to "direct deposit" Employees. No Employee is owed more than the maximum priority claim amount of $10,000. Subject to Court approval, ITC intends to honor the pre-petition Employee Obligations and to pay them in the ordinary course of business during their bankruptcy cases. I believe that it is essential for the Employee Obligations to be satisfied in order to maintain morale and to ensure that ITC's Employees skilled workforce remains motivated to continue with the company. In addition, the Employees that live from paycheck to paycheck and will suffer great hardship if they are not paid in a timely fashion.

### MOTION TO ESTABLISH ADEQUATE ASSURANCE FOR UTILITIES

19. ITC has filed a motion to establish adequate assurance for its utilities. As set forth in the motion, ITC is almost entirely current on its obligations to its utilities. Under the motion, utility providers are deemed to be adequately assured of future performance by an administrative priority claim in the Debtor's bankruptcy. Utilities providers who desire additional adequate assurance will be afforded a 21-day notice period to request such relief. I believe that the proposed motion sets forth a procedure that appropriately balances a utility's rights under the Bankruptcy Code against the need for the uninterrupted provision of utility service to the Debtor's manufacturing business.

### MOTION TO LIMIT NOTICE

20. ITC has filed a motion to limit notice of the proceedings in these cases. I believe that the relief requested in that motion will conserve ITC's resources without impairing the rights of ITC's creditors to be informed and heard by this court. The Debtors have filed First Day Motions to protect the interests of their Employees and customers. Consequently, providing notice of these proceedings to the Employees and to the customers would be costly and unnecessary. It would also cause substantial confusion, and impair and degrade morale.

I declare under the penalty of perjury that the foregoing is true and correct.

DATED this 18th day of November, 2015.

By: _____
Faruk Gole